UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

BOSTON DIVISION

| | | |
|---|---|---|
| OPERATIVE PLASTERS' AND CEMENT MASONS' LOCAL UNION OFFICERS' AND EMPLOYEES' PENSION FUND, Derivatively on Behalf of STATE STREET CORPORATION, | ) ) ) ) ) ) | Case No. |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| JOSEPH L. HOOLEY, EDWARD J. RESCH, RONALD E. LOGUE, CHARLES R. LAMANTIA, KENNETT F. BURNES, ROBERT E. WEISSMAN, DAVID P. GRUBER, RICHARD P. SERGEL, LINDA A. HILL, GREGORY L. SUMME, RONALD L. SKATES, AMELIA C. FAWCETT, PETER COYM, PATRICK DE SAINT-AIGNAN, ROBERT S. KAPLAN, PAMELA D. GORMLEY, MAUREEN J. MISKOVIC, TENLEY E. ALBRIGHT, NADER F. DAREHSHORI, ARTHUR L. GOLDSTEIN, and DIANA CHAPMAN WALSH, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) ) | |
| -and- | ) ) ) | |
| STATE STREET CORPORATION, a Massachusetts corporation, | ) ) ) | |
| Nominal Defendant. | ) ) | JURY TRIAL DEMANDED |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT**

## NATURE AND SUMMARY OF THE ACTION

1.      This is a derivative action, brought by plaintiff, a shareholder of State Street Corporation ("State Street" or the "Company"), on behalf of the Company, to remedy the harm wrought by State Street's faithless fiduciaries.  These defendants' breaches of fiduciary duty have exposed the Company to billions in damages through multiple lawsuits brought by various states, agencies, and private plaintiffs.  Plaintiff seeks redress for the Company's faithless fiduciaries' willingness to gamble State Street's most valuable asset, its reputation, in exchange for short term profits and to aggrandize their own positions.  Plaintiff also seeks to hold State Street's fiduciaries accountable for their knowing breaches of duty to the Company by causing and allowing it to operate in violation of the law.

2.      This case involves two matters: (i) the Company overcharging its clients pursuant to an illegal foreign currency exchange ("FX") trading scheme; and (ii) the Company's overexposure to toxic mortgage-backed securities ("MBS").  The Individual Defendants (as defined herein) are primarily responsible for the harm caused to the Company due to their complete and utter failure to implement appropriate internal controls at State Street.  In addition, by hiding these matters from the public, the Individual Defendants compounded their wrongdoing and multiplied the damage to State Street.  In particular, by hiding the FX scheme and the Company's overexposure to MBS, the Individual Defendants caused State Street to improperly represent its financial condition and results, which in turn led to the Company's stock trading at artificially inflated levels.  The inflation harmed the Company because: (i) the Board of Directors (the "Board") agreed to and completed a $1 billion repurchase of State Street's stock at prices that no reasonable investor would have paid if it knew the truth about the Company; and (ii) resulted in a securities fraud class action against the Company brought by investors that purchased stock at these inflated prices (including in a secondary offering of the Company's stock), which became worth significantly less after the truth about State Street's financial results were revealed to the public.  Recently, the Honorable Nancy Gertner (D. Mass.) denied the defendants' motion to dismiss in the securities fraud class action, significantly increasing the costs to the Company of the lawsuit, since it is now engaged in discovery, and increasing the

likelihood that State Street will have to make a significant payment to these allegedly wronged investors.

**The FX Scheme**

3.      Since 2001, State Street engaged in a FX trading scheme described as an "unconscionable fraud" by the California Attorney General.  Under this scheme, State Street promised its clients that they would receive the most competitive rates available for FX transactions, which would be priced based upon the interbank rate at the time the trades were executed.  The interbank rate is the price at which major banks buy and sell currency to each other.  The interbank rate fluctuates throughout the day, as one country's currency becomes more or less valuable in comparison to another country's currency.  Essentially, State Street promised its clients that they would receive the same rate the Company did on FX transactions.  State Street, however, failed to provide its clients with the promised FX pricing.  Instead, State Street executed an FX trade on behalf of its clients at a specific rate, but instead of charging that same rate to the clients, the employees in the Company's FX offices would review the FX rates for that day and charge the clients a less favorable rate.  State Street would then pocket the difference between the actual exchange rate and the exchange rate State Street charged.

4.      Particularly noteworthy about the FX scheme is the complete and utter lack of internal controls at the Company over State Street's FX traders that allowed this to occur.  In fact, as revealed in the securities class action, before 2006 the Company had no risk management system.  Further, management at State Street implemented a system that basically encouraged the fraudulent overcharging of clients.  In carrying out FX transactions for its clients, State Street kept two separate software systems.  One system, known as Wall Street Systems ("WSS"), contained the actual FX rate and included a time stamp for the actual transaction.  The FX trader would then manually enter the exchange rate data into a second system which did not include time stamps of when the transaction occurred, which was then sent back to the clients.  FX traders used this second set of cooked books to come up with any rate they wanted to charge and disclose to clients.

5.      Given the length, scope, and amount of money at stake, the top executives at the Company had to be aware of the wrongdoing.  Over the course of the FX scheme, the Company

executed thousands of transactions that consistently resulted in favorable FX rates, resulting in hundreds of millions of dollars in profits.  In fact, the fiduciary duties of the Individual Defendants require them to be aware of the inception of such an important source of income for the Company. In addition, the length and scope of the wrongdoing supports the fact that the Individual Defendants also knew that the Company was concealing how it made such large profits from FX transactions. Quotes from internal e-mails made public through the California Attorney General's action against State Street over the illegal FX scheme shows that executives at the Company were well aware of the need to keep the actual FX pricing hidden from State Street's clients.  For instance, one e-mail from an unidentified State Street Senior Vice President to other State Street executives stated that "[i]f providing execution costs will give [the California Public Employees' Retirement System] any insight into how much we make off of FX transactions, I will be shocked if [a State Street V.P.] or anyone would agree to reveal that information."

6.     When the California Attorney General revealed State Street's illegal FX trading scheme to the unsuspecting public, the Company's market capitalization fell by more than $3 billion.

**The Company's Improper Statements Concerning Its Overexposure to Toxic MBS**

7.     In addition to engaging in a FX trading scheme, the Individual Defendants also bear responsibility for State Street's concealment of the deterioration of its investments in MBS, including the investments through its off-balance sheet entities, known as "conduits."  Between 2006 and 2009, during the global financial crisis, State Street appeared to have strong financial performance even as established Wall Street institutions, such as Bear Stearns and Lehman Brothers, collapsed.  State Street's strong financial performance was an illusion, however, because the Company's investment portfolio and conduits contained billions in toxic MBS.

8.     Even though the Company held billions in toxic MBS, the defendants repeatedly issued statements that the Company held "high quality" assets, which continued to perform well in its asset-backed programs.  Certain of the defendants boasted that they had a "rigorous credit review process," which included a "dedicated surveillance team responsible for monthly monitoring of asset performance" and a "long-established conservative risk compliance and credit capability."  None of these statements were true.  Finally, in January 2009, State Street shocked the public when it

revealed that it had unrealized losses totaling nearly $10 billion.  This revelation led to a decline in more than 60% of State Street's market value.  Including the drop after the California Attorney General revealed the illegal FX trading scheme, the Company's market capitalization fell almost $14 billion from its high point during the relevant period of wrongdoing.

9.      Before disclosing the Company's true financial health, however, the Board of State Street authorized the Company to purchase its own stock.  Between July 2007 and January 2008, during the height of the Individual Defendants' improper statements, the Company purchased over $1 billion worth of its own stock at artificially inflated prices.

**The Shareholder Demand**

10.      On October 13, 2011, plaintiff, a shareholder of State Street, made a demand that the Company's Board investigate, address, and commence proceedings against certain officers and directors of the Company for violations of any applicable laws.  Specifically, plaintiff's demand letter commanded the Board to investigate two areas: (i) FX revenue pricing practices; and (ii) the Company's investments in its conduits and investment portfolio, including the billions it lost from these investments and the billions in liability it faces from failing to properly disclose the truth about these investments.  In response, the Board said that it formed a special committee of defendants Kennett F. Burnes ("Burnes"), Amelia C. Fawcett ("Fawcett"), and Robert S. Kaplan ("Kaplan") (the "Special Committee").  The make-up of the Special Committee tasked with reviewing plaintiff's demand is astonishing.  Defendants Burnes and Fawcett are defendants in the securities class action and had already lost their motion to dismiss the securities case claims against them at the time of plaintiff's demand.  Therefore, the Board placed two of the very people facing significant liability to the Company for the improper statements State Street issued to the public onto the Special Committee.  In addition, Burnes was named as the Chair of the Special Committee.  In light of the Special Committee's make-up, the outcome of plaintiff's demand was never in doubt.  The Board, based on the recommendation of the Special Committee, refused to bring an action against those responsible.  Now, in light of the Board's improper refusal to act, plaintiff brings this action to remedy the harm caused by defendants' wrongful actions

## JURISDICTION AND VENUE

11.     Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i) State Street maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to State Street, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

14.     Plaintiff Operative Plasters' and Cement Masons' Local Union Officers' and Employees' Pension Fund was a shareholder of State Street at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current State Street shareholder.  Plaintiff is a citizen of Pennsylvania and Maryland.

**Nominal Defendant**

15.     Nominal Defendant State Street is a Massachusetts corporation with its principal executive offices located at One Lincoln Street, Boston, Massachusetts.  State Street is named in this Complaint as a nominal defendant solely in a derivative capacity, and this shareholders derivative action is on its behalf.  State Street is a financial holding company that provides a range of financial services to institutional investors.  As of December 31, 2011, State Street had $21.81 trillion of

assets under custody and administration and $1.86 trillion of assets under management.  With operations in twenty-nine countries and a presence in more than 100 geographic markets worldwide, State Street's clients include mutual funds, collective investment funds and other investment pools, corporate and public retirement plans, insurance companies, foundations, endowments, and investment managers.

**Individual Defendants**

16.     Defendant Joseph L. Hooley ("Hooley") is State Street's Chairman of the Board and has been since January 2011; Chief Executive Officer ("CEO") and has been since March 2010; President and has been since April 2008; and a director and has been since October 2009.  Hooley was also State Street's Chief Operating Officer from April 2008 to March 2010; Executive Vice President and head of Investor Services from 2002 to April 2008; and Vice Chairman and Global Head of Investment Servicing and Investment Research and Trading and Operations and Technology from 2006 to April 2008.  Hooley is also a member of State Street's Risk and Capital Committee and has been since at least July 2010.  Hooley has been responsible for all of State Street's asset servicing and trading activities worldwide in his various roles within State Street, and has served on the Company's Operating Group, which is comprised of State's most senior policy-making officers. Hooley joined State Street in 1986.  Hooley knowingly or recklessly made improper statements in the Company's press releases and public filings.  Hooley also failed to maintain adequate internal controls.  State Street paid Hooley the following compensation as an executive:

| Year | Salary | Stock Awards | Option / SAR Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|-------------|--------------------|---------------------------------------|-----------------------|----------------------|-------|
| 2011 | $1,000,000 | $8,076,905 | - | $2,608,000 | $4,192,459 | $310,600 | $16,187,964 |
| 2010 | $961,058 | $5,995,151 | - | $4,000,000 | $1,666,517 | $296,394 | $12,919,120 |
| 2009 | $775,000 | $10,000,023 | - | $2,516,300 | $468,785 | $143,440 | $13,903,548 |
| 2008 | $763,462 | $6,453,295 | $3,519,863 | - | $2,256,574 | $157,687 | $13,150,881 |
| 2007 | $725,000 | $4,973,550 | $4,081,051 | $1,937,500 | $1,974,534 | $103,373 | $13,795,008 |
| 2006 | $719,231 | $2,368,961 | $1,101,160 | $2,583,333 | $410,978 | $43,981 | $7,227,644 |

Hooley is a citizen of Massachusetts.

17.     Defendant Edward J. Resch ("Resch") is State Street's Executive Vice President and Chief Financial Officer ("CFO") and has been since 2002.  Resch was also State Street's Treasurer from 2006 to January 2008.  Resch knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's foreign currency trades and

the Company's exposure in its MBS portfolio and conduits. Resch also failed to maintain adequate internal controls. State Street paid Resch the following compensation as an executive:

| Year | Salary | Stock Awards | Option / SAR Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|--------------|---------------------|----------------------------------------|-------------------------|------------------------|-------|
| 2011 | $800,000 | $4,323,913 | - | $1,488,000 | $1,268,314 | $252,345 | $8,132,572 |
| 2010 | $776,923 | $4,326,785 | - | $3,509,100 | $767,619 | $61,150 | $9,441,577 |
| 2009 | $700,000 | $6,000,014 | - | $1,819,100 | $478,592 | $49,234 | $9,046,940 |
| 2008 | $688,462 | $4,354,737 | $2,393,027 | - | $782,889 | $74,000 | $8,293,115 |
| 2007 | $650,000 | $3,142,474 | $2,529,975 | $1,291,500 | $581,643 | $23,750 | $8,219,342 |
| 2006 | $644,231 | $2,680,365 | $1,089,005 | $1,722,000 | $255,414 | $23,077 | $6,414,092 |

Resch is a citizen of New Jersey.

18.     Defendant Ronald E. Logue ("Logue") was State Street's Chairman of the Board from June 2004 to January 2011; CEO from June 2004 to March 2010; and a director from 2000 to January 2011. Logue also held various other positions at State Street from 1990 to June 2004, including Chief Operating Officer, President, Senior Vice President, Vice Chairman, and head of investment servicing for U.S. mutual funds. Logue was also a member of State Street's Risk and Capital Committee from at least March 2006 to March 2010. Logue's role as Chairman and CEO entailed responsibilities over all aspects of State Street's business, governance, operations, financial matters, strategy, regulatory matters, and employees. Logue is also named as a defendant in the federal securities and Employee Retirement Income Security Act ("ERISA") actions. Logue knowingly or recklessly made improper statements in the Company's press releases and public filings. State Street paid Logue the following compensation as an executive:

| Year | Salary | Stock Awards | Option / SAR Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|--------------|---------------------|----------------------------------------|-------------------------|------------------------|-------|
| 2010 | $176,923 | $1,554,632 | - | - | $8,442,653 | $809,441 | $10,983,649 |
| 2009 | $1,000,000 | - | - | $5,390,000 | $1,461,164 | $143,594 | $7,994,758 |
| 2008 | $1,000,000 | $10,206,667 | $5,406,123 | - | $7,783,662 | $120,824 | $24,517,276 |
| 2007 | $1,000,000 | $8,278,930 | $6,415,125 | $3,750,000 | $7,414,697 | $107,345 | $26,966,097 |
| 2006 | $1,000,000 | $9,499,318 | $8,450,054 | $5,000,000 | $2,698,318 | $109,820 | $26,757,510 |

Logue is a citizen of Massachusetts.

19.     Defendant Charles R. LaMantia ("LaMantia") is a State Street director and has been since 1993. LaMantia is also a member of State Street's Examining and Audit Committee and a member of the Risk and Capital Committee and has been since at least March 2006. LaMantia was Chairman of State Street's Examining and Audit Committee from at least March 2006 to at least

April 2010.  LaMantia is also named as a defendant in the federal securities action.  LaMantia knowingly or recklessly made improper statements in the Company's public filings and failed to maintain adequate internal controls.  State Street paid LaMantia the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|------------------|--------------|-------|
| 2011 | $164,000 | $130,000 | $294,000 |
| 2010 | $193,500 | $110,000 | $303,500 |
| 2009 | $176,500 | $110,000 | $286,500 |
| 2008 | $171,000 | $110,000 | $281,000 |
| 2007 | $148,750 | $110,000 | $258,750 |
| 2006 | $121,250 | $105,000 | $226,250 |

LaMantia is a citizen of Massachusetts.

20.     Defendant Burnes is State Street's Lead Director and has been since at least July 2010 and a director and has been since October 2003.  Burnes was also a member of State Street's Examining and Audit Committee from at least April 2009 to at least April 2010 and a member of the Risk and Capital Committee from at least March 2006 to at least April 2010.  Burnes is named as a defendant in the federal securities action.  Burnes knowingly or recklessly made improper statements in the Company's public filings and failed to maintain adequate internal controls.  State Street paid Burnes the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|------------------|--------------|------------------------|-------|
| 2009 | $78,000 | $195,000 | $11,114 | $284,114 |
| 2008 | $63,000 | $195,000 | - | $258,000 |
| 2007 | $31,500 | $180,000 | - | $211,500 |
| 2006 | $28,500 | $170,000 | - | $198,500 |

Burnes is a citizen of Massachusetts.

21.     Defendant Robert E. Weissman ("Weissman") is a State Street director and has been since April 1989.  Weissman was also State Street's Lead Director from at least March 2006 to at least March 2008.  Weissman is named as a defendant in the federal securities action.  Weissman knowingly or recklessly made improper statements in the Company's public filings and failed to maintain adequate internal controls.  State Street paid Weissman the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|------|------|------|------|
| 2011 | $27,000 | $205,000 | - | $232,000 |
| 2010 | $28,500 | $185,000 | $12,116 | $225,616 |
| 2009 | $36,000 | $185,000 | $22,114 | $243,114 |
| 2008 | $40,500 | $185,000 | - | $225,500 |
| 2007 | $31,750 | $205,000 | - | $236,750 |
| 2006 | $43,250 | $170,000 | - | $213,250 |

Weissman is a citizen of Florida.

22.     Defendant David P. Gruber ("Gruber") is a State Street director and has been since September 1997.  Gruber is also a member of State Street's Examining and Audit Committee and has been since at least March 2006.  Gruber is a member of State Street's Risk and Capital Committee and has been since at least March 2006 and was Chairman of that committee from at least March 2007 to at least April 2010.  Gruber is also named as a defendant in the federal securities action.  Gruber made improper statements in the Company's public filings and failed to maintain adequate internal controls.  State Street paid Gruber the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|------|------|------|------|
| 2011 | $164,000 | $130,000 | - | $294,000 |
| 2010 | $190,500 | $110,000 | - | $300,500 |
| 2009 | $175,000 | $110,000 | $11,114 | $296,114 |
| 2008 | $165,875 | $110,000 | - | $275,875 |
| 2007 | $145,625 | $110,000 | - | $255,625 |
| 2006 | $123,500 | $105,000 | - | $228,500 |

Gruber is a citizen of Florida.

23.     Defendant Richard P. Sergel ("Sergel") is a State Street director and has been since 1999.  Sergel is also a member of State Street's Examining and Audit Committee and has been since at least April 2011.  Sergel is named as a defendant in the federal securities action.  Sergel made improper statements in the Company's public filings and failed to maintain adequate internal controls.  State Street paid Sergel the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|------|------|------|------|
| 2011 | $163,000 | $130,000 | $25,721 | $318,721 |
| 2010 | $170,500 | $110,000 | $25,720 | $306,220 |
| 2009 | $129,000 | $110,000 | $25,509 | $264,509 |
| 2008 | $125,000 | $110,000 | $25,553 | $260,553 |
| 2007 | $91,000 | $110,000 | - | $201,000 |
| 2006 | $27,000 | $170,000 | - | $197,000 |

Sergel is a citizen of Massachusetts.

24.     Defendant Linda A. Hill ("Hill") is a State Street director and has been since 2000. Hill is named as a defendant in the federal securities action.  Hill knowingly or recklessly made improper statements in the Company's public filings and failed to maintain adequate internal controls.  State Street paid Hill the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|------|------|------|------|
| 2011 | $112,500 | $130,000 | - | $242,500 |
| 2010 | $132,750 | $110,000 | - | $242,750 |
| 2009 | $118,500 | $110,000 | - | $228,500 |
| 2008 | $89,250 | $110,000 | $14,863 | $214,113 |
| 2007 | $25,500 | $180,000 | - | $205,500 |
| 2006 | $19,500 | $170,000 | - | $189,500 |

Hill is a citizen of Massachusetts.

25.     Defendant Gregory L. Summe ("Summe") is a State Street director and has been since 2001.  Summe was also State Street's Lead Director from at least April 2009 to at least April 2010. Summe is named as a defendant in the federal securities action.  Summe knowingly or recklessly made improper statements in the Company's public filings and failed to maintain adequate internal controls.  State Street paid Summe the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|------|------|------|------|
| 2011 | $24,000 | $220,000 | $25,336 | $269,336 |
| 2010 | $28,500 | $200,000 | $25,335 | $253,835 |
| 2009 | $34,500 | $225,000 | $26,333 | $285,833 |
| 2008 | $31,500 | $225,000 | - | $256,500 |
| 2007 | $24,000 | $180,000 | - | $204,000 |
| 2006 | $24,000 | $170,000 | - | $194,000 |

Summe is a citizen of Massachusetts.

26.     Defendant Ronald L. Skates ("Skates") is a State Street director and has been since 2002.  Skates is also Chairman of State Street's Examining and Audit Committee and has been since at least July 2010 and a member and has been since at least March 2006.  Skates is a member of the Risk and Capital Committee and has been since at least April 2010.  Skates is named as a defendant in the federal securities class action.  Skates knowingly or recklessly made improper statements in the Company's public filings and failed to maintain adequate internal controls.  State Street paid Skates the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|------|------|------|------|
| 2011 | $194,000 | $130,000 | $26,117 | $350,117 |
| 2010 | $79,500 | $220,000 | $26,116 | $325,616 |
| 2009 | $67,500 | $195,000 | $26,114 | $288,614 |
| 2008 | $52,500 | $195,000 | $26,211 | $273,711 |
| 2007 | $41,750 | $187,500 | - | $229,250 |
| 2006 | $38,250 | $170,000 | - | $208,250 |

Skates is a citizen of Massachusetts.

27.    Defendant Fawcett is a State Street director and has been since December 2006. Fawcett is also Chairman of State Street's Risk and Capital Committee and has been since at least July 2010 and a member and has been since at least April 2009. Fawcett is named as a defendant in the federal securities class action. Fawcett knowingly or recklessly made improper statements in the Company's public filings and failed to maintain adequate internal controls. State Street paid Fawcett the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|------|------|------|------|
| 2011 | $145,000 | $130,000 | $14,836 | $289,836 |
| 2010 | $51,000 | $210,000 | - | $261,000 |
| 2009 | $54,000 | $185,000 | $20,833 | $259,833 |
| 2008 | $39,000 | $185,000 | - | $224,000 |
| 2007 | $22,500 | $236,667 | - | $259,167 |

Fawcett is a citizen of Massachusetts.

28.    Defendant Peter Coym ("Coym") is a State Street director and has been since December 2006. Coym is also a member of State Street's Examining and Audit Committee and has been since at least July 2010. Coym is named as a defendant in the federal securities class action. Coym knowingly or recklessly made improper statements in the Company's public filings and failed to maintain adequate internal controls. State Street paid Coym the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2011 | $143,500 | $130,000 | $273,500 |
| 2010 | $150,250 | $110,000 | $260,250 |
| 2009 | $108,000 | $110,000 | $218,000 |
| 2008 | $105,250 | $110,000 | $215,250 |
| 2007 | $96,667 | $145,000 | $241,667 |

Coym is a citizen of Germany.

29.     Defendant Patrick de Saint-Aignan ("de Saint-Aignan") is a State Street director and has been since March 2009.  De Saint-Aignan is also a member of State Street's Risk and Capital Committee and has been since at least April 2010.  de Saint-Aignan failed to maintain adequate internal controls.  State Street paid de Saint-Aignan the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|-------------------|--------------|------------------------|-------|
| 2011 | $121,000 | $130,000 | $25,721 | $276,721 |
| 2010 | $142,750 | $110,000 | $25,720 | $278,470 |
| 2009 | $92,750 | $128,333 | $25,599 | $246,682 |

de Saint-Aignan is a citizen of New York.

30.     Defendant Kaplan is a State Street director and has been since March 2009.  Kaplan failed to maintain adequate internal controls.  State Street paid Kaplan the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2011 | $34,500 | $205,000 | $239,500 |
| 2010 | $33,000 | $185,000 | $218,000 |
| 2009 | $22,500 | $215,833 | $238,333 |

Kaplan is a citizen of New York.

31.     Defendant Pamela D. Gormley ("Gormley") was State Street's Executive Vice President and head of corporate systems and operations from December 2006 to 2009.  Gormley was also State Street's Executive Vice President and Corporate Controller from at least April 2004 to December 2006.  Gormley is named as a defendant in the federal securities and ERISA actions.  Gormley knowingly or recklessly made improper statements in the Company's public filings and failed to maintain adequate internal controls.  Gormley is a citizen of Massachusetts.

32.     Defendant Maureen J. Miskovic ("Miskovic") was State Street's Executive Vice President and Chief Risk Officer from April 2008 to March 2010.  Miskovic was also a State Street director from December 2006 to April 2008.  Miskovic was a member of State Street's Examining and Audit Committee during at least March 2008.  As Executive Vice President and Chief Risk Officer, Miskovic was responsible for leading State Street's risk management function globally.  Miskovic failed to maintain adequate internal controls.  State Street paid Miskovic the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2008 | $10,875 | - | $10,875 |
| 2007 | $33,750 | $236,667 | $270,417 |

Miskovic is a citizen of Switzerland.

33.    Defendant Tenley E. Albright ("Albright") was a State Street director from 1993 to April 2008.  Albright was also a member of State Street's Examining and Audit Committee from at least March 2006 to at least March 2008.  Albright failed to maintain adequate internal controls. State Street paid Albright the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2008 | $15,000 | - | $15,000 |
| 2007 | $41,750 | $187,500 | $229,250 |
| 2006 | $36,750 | $170,000 | $206,750 |

Albright is a citizen of Massachusetts.

34.    Defendant Nader F. Darehshori ("Darehshori") was a State Street director from 1990 to May 2009.  Darehshori is also named as a defendant in the federal securities action.  Darehshori knowingly or recklessly made improper statements in the Company's public filings failed to maintain adequate internal controls.  State Street paid Darehshori the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|-------------------|--------------|------------------------|-------|
| 2009 | $41,250 | - | $30,504 | $71,754 |
| 2008 | $121,750 | $110,000 | - | $231,750 |
| 2007 | $104,750 | $110,000 | - | $214,750 |
| 2006 | $81,750 | $105,000 | - | $186,750 |

Darehshori is a citizen of Massachusetts.

35.    Defendant Arthur L. Goldstein ("Goldstein") was a State Street director from 1995 to April 2008.  Goldstein failed to maintain adequate internal controls.  State Street paid Goldstein the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2008 | $27,500 | - | $27,500 |
| 2007 | $88,000 | $110,000 | $198,000 |
| 2006 | $33,000 | $170,000 | $203,000 |

Goldstein is a citizen of Massachusetts.

36.     Defendant Diana Chapman Walsh ("Walsh") was a State Street director from 1997 to April 2008.  Walsh was also a member of State Street's Risk and Capital Committee during at least March 2008.  Walsh failed to maintain adequate internal controls.  State Street paid Walsh the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2008 | $13,500 | - | $13,500 |
| 2007 | $33,000 | $180,000 | $213,000 |
| 2006 | $25,500 | $170,000 | $195,500 |

Walsh is a citizen of Massachusetts.

37.     The defendants identified in ¶¶16, 18-30, 32-36 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶19-20, 22-23, 26, 28, 32-33 are referred to herein as the "Examining and Audit Committee Defendants."  The defendants identified in ¶¶16, 18-20, 22, 26-27, 29, 36 are referred to herein as the "Risk and Capital Committee Defendants."  Collectively, the defendants identified in ¶¶16-36 are sometimes collectively referred to herein as the "Individual Defendants."

## DUTIES OF STATE STREET'S DIRECTORS AND OFFICERS

**Fiduciary Duties**

38.     Because of their positions as officers or directors of State Street, the Individual Defendants control the business affairs of the Company.   These Individual Defendants owed and owe State Street and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care. These fiduciary obligations require that the Individual Defendants use their utmost ability to manage State Street in an honest manner.  Further, the Individual Defendants were and are required to act in the best interests of State Street, to benefit all shareholders equally, and to not act in their own personal interest.

39.     In addition, each State Street director and officer owes the Company and its shareholders the fiduciary duty to exercise good faith and diligence.  This fiduciary duty requires that State Street's officers and directors properly administer the Company's affairs, use and preserve the Company's property, and engage in fair dealing.  Likewise, as officers or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate information

- 14 -

about the Company's performance so that the market price of the Company's stock would be based on accurate information.

**Examining and Audit Committee Duties**

40.     In addition to these duties, defendants Albright, Burnes, Coym, Gruber, LaMantia, Miskovic, Sergel, and Skates owed specific duties to State Street as Examining and Audit Committee members.  The Examining and Audit Committee met sixteen times during 2007, twenty times during 2008, and twenty-three times in 2009.  The Examining and Audit Committee's Charter requires that committee members review the Company's earnings press releases, guidance, quarterly and annual financial statements, and internal controls.  For instance, the 2004 Examining and Audit Committee's Charter included the following provisions:

> **MISSION**
>
> On behalf of the Corporation's Board of Directors, the Examining and Audit Committee (the "Committee") oversees the operation of a comprehensive system of internal ***controls covering the integrity of the Corporation's financial statements and reports, compliance with laws, regulations, and corporate policies***, and the independent auditor's qualifications, performance, and independence…. The Committee conducts eight full meetings, ***four pre-earnings release meetings*** each year and meetings as necessary to review and discuss the annual audited financial statements and quarterly financial statements
>
> \*   \*   \*
>
> **RESPONSIBILITIES**
>
> \*   \*   \*
>
> …Meet to review and discuss with management and the independent auditor the annual audited financial statements and quarterly financial statements, including review of Management's Discussion and Analysis of Financial Condition and Results of Operations. Discuss the earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies. On a quarterly basis, meet to review and discuss in separate private sessions with the independent auditor, the General Auditor, and management, the accounting policies and financial controls of the Corporation.
>
> \*   \*   \*
>
> …Review and discuss the following with appropriate representatives of management:
>
> Material contingent liabilities and pending litigation

The Corporation's Compliance Program

Data security policies

Disaster recovery plans

Compliance with Federal Reserve Bank Regulation H (Bank Protection Act)

The Corporation's Standard of Conduct

Reports required under the Federal Deposit Insurance Corporation Improvement Act of 1991

Policies with respect to risk assessment and risk management

41.     In 2008, the Board amended the Examining and Audit Committee Charter to include the following additional duties: "Review and discuss major issues regarding accounting principles and financial statement presentations; analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements; and the effect of regulatory and accounting initiatives, *as well as off-balance sheet structures, on the financial statements of the Corporation*" and "Review and discuss with management and the independent auditor management's report on internal control over financial reporting and the independent auditor's attestation of such report."

**Executive and Risk and Capital Committee Duties**

42.     The Executive Committee of the Board was charged with overseeing the Company's risk management until April 2009.  According to the Company's 2007 Proxy Statement, the Executive Committee's purpose and function included "reviewing credit and risk management reports, key risk indicators, the portfolio of investment securities, strategic investments of the Company, personnel issues, and risk management policies."  The Company's 2008 and 2009 proxies describe the Executive Committee in a substantially similar manner, except that they provide that the Executive Committee is allowed to approve and act on these matters, not just review them.  The Executive Committee's Charter in 2008 further explained that "The Committee is also responsible for oversight of the State Street's assessment and management of risk."

43.     Defendants Burnes, LaMantia, Logue, and Walsh were members of the Executive Committee between 2007 and 2008.  The Executive Committee met eleven times in 2007 and fourteen times in 2008.

44.     In May 2009, the Board created the Risk and Capital Committee.  The purpose of the Committee is to "assist[] the Board in fulfilling its oversight responsibilities relating to the Company's assessment and management of risk and capital adequacy."  Defendants Burnes, de Saint-Aignan, Fawcett, Gruber, Hooley, LaMantia, Logue, Skates, and Walsh served or serve on the Risk and Capital Committee.  The Risk and Capital Committee met twelve times in 2009.  The Risk and Capital Committee Charter, in relevant part, states:

Committee Authority and Responsibilities

1.     General.  The Committee has the following general authority and responsibilities, which it may exercise in its discretion:

•     The Committee is responsible for reviewing and discussing with management the Company's assessment and management of risk, including market, operational, fiduciary, interest rate, liquidity, business and credit risks, and related policies.

•     The Committee shall provide oversight on the strategic capital governance principles and controls and monitor capital adequacy in relation to risk.

* * *

2.     Related Matters.  The Committee's responsibilities include reviewing and approving, as it deems appropriate and on behalf of the Board, matters related to the Committee's general authority, oversight and responsibilities, such as the following:

* * *

•     Provisions, Charge-offs, and Recoveries to the Allowances for Credit and Securities Processing Losses.

* * *

3.     Regulatory Matters.  The Committee shall also have the following duties and powers.

- The Committee is responsible for discharging the duties and obligations of the Board under Basel II.

* * *

4. Other.

* * *

- The Committee shall make regular reports to the Board.

**Control, Access, and Authority**

45. Because of their positions as directors or officers of State Street, the Individual Defendants exercised control over the wrongful acts in this Complaint, including the contents of State Street's public statements.

46. In addition, because of their positions within the Company, each Individual Defendants had access to non-public information about State Street's financial condition. While in possession of this material, non-public information, the Individual Defendants made improper representations regarding the Company, including representations regarding State Street's financial results.

47. The Individual Defendants acted as agents of each other and agents of State Street. While in the course and scope of this agency, the wrongful acts alleged in the Complaint occurred.

**Reasonable and Prudent Supervision**

48. To discharge their duties, the officers and directors of State Street were required to exercise reasonable and prudent supervision over the financial affairs of the Company. By virtue of those duties, the officers and directors of State Street were required to, among other things:

(a) provide accurate information to investors and analysts concerning the Company's financial condition, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of internal controls;

(b) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the U.S. Securities and Exchange Commission ("SEC") and the investing public;

(c)     refrain from acting upon material inside corporate information to benefit themselves;

(d)     conduct the affairs of the Company in an efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(e)     remain informed about how State Street conducted its operations, make reasonable inquiries upon the receipt of information concerning unsound practices, correct any unsound practices, and make necessary disclosures to comply with securities laws; and

(f)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all laws, rules, and regulations.

**Breaches of Duties**

49.     As a directors and officers, the Individual Defendants owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, diligence, and due care to manage the Company's affairs and to preserve its property.  The Individual Defendants' conduct involves a knowing and culpable violation of their obligations, a lack of good faith, and a reckless disregard for their duties.  The Individual Defendants were either aware or should have been aware that their conduct posed a risk of serious injury to the Company.  By failing to prevent this conduct, the Board ratified this conduct.

50.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in an improper FX trading scheme, to conceal the Company's exposure to losses from its MBS portfolio and conduits, and to fail to implement proper internal controls.  The Individual Defendants also failed to prevent the other Individual Defendants from taking these illegal actions.  In addition, because of defendants' illegal actions and course of conduct, the Company has been sued in the federal securities and ERISA actions.  Thus, State Street has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING, AND CONCERTED ACTION

51.    The wrongful conduct in this Complaint gives rise to primary liability.  In committing this wrongful conduct, the Individual Defendants conspired with one another.  Further, the Individual Defendants aided each other in breaching their respective fiduciary duties.

52.    The Individual Defendants, collectively and individually, acted to conceal the Company's FX trading scheme, to conceal the Company's exposure to MBS, to prevent the Company from implementing proper internal controls, and to deceive the investing public regarding the Individual Defendants' management of the Company.   In furtherance of this conspiracy, the Individual Defendants committed the acts detailed in this Complaint.

53.    The purpose and effect of the Individual Defendants' conspiracy was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment.  Moreover, the Individual Defendants' conspiracy concealed adverse information concerning the Company's financial condition.

54.    The Individual Defendants accomplished their conspiracy by causing the Company to: (i) overcharge its clients through an illegal FX scheme; (ii) purposefully or recklessly release improper statements concerning the FX scheme and the Company's exposure to MBS; and (iii) repurchase $1 billion worth of its stock at inflated levels.  Because the actions described in this Complaint occurred under the Board's authority, each Individual Defendants was a direct, necessary, and substantial participant in the conspiracy.

55.    The Individual Defendants aided in the wrongful conduct outlined in this Complaint.  By assisting in this wrongful conduct, each Individual Defendant acted with knowledge of the primary wrongdoing, accomplished the wrongdoing, and was aware of his or her contribution to the wrongdoing.

## THE ILLEGAL FX TRADING SCHEME

56.    State Street serves as the custodian for over 40% of the public pension funds in the United States.  The Company is the largest such custodian in the country, with over $4.4 trillion in pension assets.

57.     State Street offers FX services to its clients, which allows clients to exchange U.S. dollars and foreign currencies.  All of the FX transactions allegedly are executed at the prevailing exchange rate, most commonly the interbank rate, which fluctuates throughout the day and is tracked and published by multiple sources.  For many of its large custodial clients, State Street conducted indirect FX trades in which the client was not quoted an exchange rate before the transaction occurred.  Instead, State Street was supposed to execute the FX transaction according to terms already in place through its contract with the client.  Under the typical contract terms, State Street was obligated to provide certain of its clients with the same exchange rate that it used to make the trade.

58.     State Street stated in its 2009 Annual Report on Form 10-K filed with the SEC on February 22, 2010, that the same FX trading services it offered to the  State of California's largest public pension funds, the California Public Employees' Retirement System ("CalPERS") and the California State Teachers' Retirement System ("CalSTRS"), it also offered "to a broad range of custody clients in the U.S. and internationally."  The terms of a typical contract between State Street and its custodial clients are illustrated by the contract between State Street and CalPERS and CalSTRS, which states:

> All trades are priced based on the interbank rate at the time the trade is executed.  As *all trades are priced based on the prevailing interbank rate at the time of the trade, we guarantee that we provide competitive pricing for all foreign exchange transactions*, regardless of size, currency or contract type.

> * * *

> Clients executing foreign exchange transactions with State Street ... *are guaranteed to receive the most competitive rates available for all FX transactions, regardless of size, currency or contract type, because all trades are priced based on the interbank rates at the time the trade is executed.*

59.     FX trading was an extremely lucrative business for State Street.  Between 2006 and 2009, State Street's revenues from FX trading increased significantly and comprised a significant percentage of its total revenue.  FX revenue increased 10% in 2005 to $468 million, increased 31% in 2006 to $611 million, increased 31% in 2007 to $802 million, and increased 25% in 2008 to $1.08 billion.

60.     State Street's financial statements stressed the importance of the Company's FX trading revenue to its operations.  For instance, defendants Logue, Resch, Albright, Burnes, Coym, Dareshori, Fawcett, Goldstein, Gruber, Hill, LaMantia, Miskovic, Sergel, Skates, Summe, Walsh, and Weissman stated in the Company's 2006 Annual Report on Form 10-K filed with the SEC on February 20, 2007, that "foreign exchange trading revenue increased 31%, to $611 million from $468 million in 2005, and benefited from a strong first half of the year."

61.     During 2007, the Individual Defendants continued touting the strength of the Company's FX trading.  On State Street's earnings conference call held on October 16, 2007, defendant Logue stated:

> [W]hile market conditions in the third quarter presented challenges … it also created more opportunities in foreign exchange and in securities finance than we usually expect in the third quarter…. ***Revenue from foreign exchange increased 98% from the year ago quarter, and 29% from the second quarter***.

62.     On that same conference call, defendant Resch declared that, "***[u]nusually strong volatility in our foreign exchange business drove a 98% increase in foreign exchange trading revenue compared with the third quarter of last year, and up 29% from the second quarter***."

63.     Analysts noticed State Street's increase in FX trading revenue.  On October 16, 2007, RBC Capital Markets issued an analyst report noting that State Street's earnings per share ("EPS") was $0.24 per share above RBC's estimate and $0.21 per share better than the consensus estimate. RBC attributed most of the Company's success to its FX revenue: "Approximately $0.17 of the increase was due to much better than expected gains in FX trading income due to volatility in the markets and higher volumes."

64.     On State Street's January 15, 2008 earnings conference call, defendant Logue declared that, "[w]hile market conditions in the second half of the year presented challenges, ***it also created more opportunities for overperformance in foreign exchange and in securities finance. Foreign exchange revenue was up 31%***."

65.     Also, on that same conference call, defendant Resch announced that, "***[h]igher volumes and stronger volatility in our foreign exchange business drove a 79% increase in foreign***

*exchange trading revenue, compared with fourth quarter of 2006, and up 13% from the third quarter.*"

66.     This increased FX trading revenue surprised analysts.  On January 15, 2008, Merrill Lynch issued a report stating that State Street's "[s]ecurities lending and FX trading [are] much better than expected."

67.     In 2007, State Street's financial statements again focused on the Company's FX trading revenue.  In State Street's 2007 Annual Report on Form10-K filed with the SEC on February 15, 2008, defendants Logue, Resch, Albright, Burnes, Coym, Darehshori, Fawcett, Goldstein, Gruber, Hill, LaMantia, Miskovic, Sergel, Skates, Summe, Walsh, and Weissman stated that, "*[f]or 2007, foreign exchange trading revenue increased 31%, to $802 million from $611 million in 2006, and benefited from the disruption in the global securities markets that occurred in the second half of the year.  The increase was mainly driven by a 39% increase in customer volumes.*"

68.     The Company's press releases touted State Street's increase in FX trading revenue.  For instance, in an April 15, 2008 press release, the Company declared, "*Trading services revenue, which includes foreign exchange trading revenue and brokerage and other fees, is $366 million for the quarter, up 66% from $220 million in the year-ago quarter.  The 74% increase in foreign exchange revenue is due to higher volatility and increase volumes.*"

69.     In its annual and quarterly filings, the Company consistently attributed its enormous growth in FX revenues to one of three factors: (i) "the volume and type of customer FX transactions"; (ii) "currency volatility and trends"; and (iii) "the management of currency market risks."

70.     As was first revealed on October 20, 2009, however, State Street did not double its FX revenue between 2005 and 2008 because of increased customer volumes, general market volatility, or "the management of currency market risks."  These increases were because of a long-running fraudulent scheme to overcharge State Street's largest institutional customers for FX trades.

**The Inflation of FX Trading Revenue**

71.     The Company's FX trading revenue actually grew because of an illegal scheme to overcharge its clients for FX trades.  When State Street received an indirect FX order from one of its

custodial clients, it executed the trade early in the day at the available FX rate. But, contrary to its contract with these clients, the Company monitored the exchange rate throughout the day and charged its clients with a chosen rate that was more beneficial to State Street. Higher rates were chosen for a purchase of foreign security and lower rates for a sale of a foreign security. State Street pocketed the difference between the amount for which the trade was actually executed and the amount that State Street charged its clients. This fraudulent practice was widely known and used inside the Company.

72.    On October 20, 2009, the California Attorney General filed a complaint in intervention ("California *qui tam*") against State Street alleging claims for violation of the False Claims Act and Unlawful Business Practices. The California Attorney General's complaint was related to a previously sealed *qui tam* whistleblower lawsuit originally filed on April 14, 2008, in the Superior Court of California. The California *qui tam* suit alleged that since at least 2001, State Street had violated the California False Claims Act by charging false or inflated FX rates since at least 2001 to CalPERS and CalSTRS. According to the California Attorney General, the whistleblowers who filed the original lawsuit were "industry insiders" with detailed knowledge of the illegal practices at State Street.

73.    According to the California *qui tam* complaint, State Street referred to clients – such as public pension funds – as "dumb" clients or "dumb money" because they had no way of double-checking the exchange rate that State Street used to execute their trade. By contrast, clients who conducted direct trades would be quoted an exchange rate by State Street before executing the transaction. These clients typically had easy access to an alternate price source, such as *Bloomberg* or *Reuters*, to double-check the truthfulness of State Street's rate quotes. Accordingly, State Street could not overcharge these clients and, thus, referred to them internally as "smart" clients or "smart money."

74.    State Street deliberately designed its systems to further the scheme to defraud its "dumb" clients. As detailed in the California *qui tam* action, these clients or their investment managers would initiate a FX transaction by sending a request, often electronically, to the Securities Processing unit of State Street, which was located on the "custody side" of the Company. This

request was then sent electronically to the State Street FX trading desk in State Street's Global Markets division, where it would appear on the Market Order Management System ("MOMS") software used by State Street's traders.  Upon receipt of the request, State Street's FX traders would check the exchange rate, set a price, and execute the transaction, which typically occurred early in the day since State Street traders are at their desks by 7:00 a.m. (EST).  All of those transactions were then entered by the trader into the WSS, which memorializes the transaction and charges the cost (for purchases) or remits the payment (for sales) directly to State Street.  The WSS would record time stamps for the actual "real time" transaction.

75.     Although the transaction was completed and the price locked in, State Street did not inform the client.  Instead, State Street observed market fluctuations until sometime around 3:00 p.m. (EST), in the afternoon, and then assigned either a higher exchange rate (for purchases) or a lower exchange rate (for sales) to the FX transactions occurring during the day.  State Street would then fraudulently apply that rate to all of the "indirect" FX transactions it had conducted that day.  As detailed in the California *qui tam* complaint, State Street would enter the "false" exchange rate into the MOMS, and the manipulated transaction details would be sent back to the custody group to be cleared with the client.  The client would not receive any record of the time or rate of the earlier transaction or the time when the false exchange rate occurred.  Once complete, State Street would automatically debit or credit its clients' custodial accounts utilizing the false exchange rates entered into the MOMS by State Street's employees.

76.     State Street deliberately falsified its internal and external reports to conceal the fraud.  The Company provided its clients with monthly "FX Spot Purchase/Sale Activity Reports," detailing all FX transactions performed for the client in that period.  It would also download the FX trading into its on-line client reporting database, MyStateStreet.com.  These reports and databases would not reflect the true exchange rate at which State Street had executed the transaction earlier in the day.  Instead, they would show the false exchange rate that was fraudulently selected by State Street and manually entered into State Street's systems.  According to the allegations in the California *qui tam* complaint, a comparison of the rates and times recorded on the WSS and on the MOMS will show

that in most cases, a corresponding trade was made earlier in the day at a different rate more favorable to State Street.

77.     On October 22, 2009, immediately after these revelations, State Street announced the retirement of its CEO, defendant Logue, effective March 1, 2010.  Logue's retirement was a surprise. During State Street's earnings conference call held on October 20, 2009, before the California Attorney General announced its lawsuit against State Street, Logue did not mention the possibility of his retirement.  An analyst from Janney Capital Markets reported on October 23, 2009 that Logue's retirement was "unexpected news" and "[t]here was no indication [that] the CEO was planning to retire." The analyst believed that Logue had been "pushed out."

78.     As has since been revealed, State Street's practices of overcharging its clients were not confined to California funds.  Other states attorneys general and the United States Attorney General are currently investigating State Street for perpetrating this scheme against other clients nationwide.  As the California Attorney General stated in October 2009: "The state of California is not alone … there are other state [lawsuits] that you are going to hear about that are presently under seal."  This fact was confirmed by State Street itself.  In State Street's 2009 Annual Report on Form 10-K filed with the SEC on February 22, 2010, the Company stated that:

> A similar action [to the California *qui tam*] has been commenced in the District of Columbia by an anonymous whistleblower who purports to sue on behalf of DC public pension funds. We provide custody and foreign exchange services to government pension plans in other jurisdictions, and attorneys general from a number of these other jurisdictions, as well as the U.S. Attorney General's office, have requested information in connection with inquiries into our foreign exchange pricing.

**Negative Impact on State Street's Financial Statements**

79.     State Street experienced a steep decline in its FX revenue following disclosure of its fraudulent FX trading practices.  In fact, State Street's fourth quarter 2009 FX revenue was $144 million, a 56% decline compared to the fourth quarter 2008 revenue of $330 million.

80.     In the Company's 2009 Form 10-K, which addressed the California *qui tam* and other investigations by various states attorneys general and the U.S. Attorney General, State Street explicitly admitted that the Company had changed its FX trading practices to add "transparency," and that this change would lead to a decline in FX revenues:

In light of the action commenced by the California Attorney General, we are providing customers with greater transparency into the pricing of this product and other alternatives offered by us for addressing their foreign exchange requirements. Although we believe such disclosures will address customer interests for increased transparency, over time such action may result in pressure on our pricing of this product or result in clients electing other foreign exchange execution options, which would have an adverse impact on the revenue from, and profitability of, this product for us.

**Lack of Adequate Risk Controls to Prevent Fraud**

81.     State Street's FX scheme thrived because of the Individual Defendants' blatant and utter failure to implement risk management policies and internal controls designed to prevent and uncover fraud.  Rather than adopt industry accepted practices, the Individual Defendants' controls appear deliberately designed its system to foster fraudulent practices.  To start, as the securities class action revealed, State Street did not even have a risk management department before 2006.  Further, State Street's flawed record keeping for its FX trades allowed Company insiders to manipulate their FX business, with no oversight from upper-level management.

82.     Even with the lack of internal controls, the Company's profits and revenues from its FX business alone should have caught the Individual Defendants' attention.  The Company literally made hundreds of millions of dollars from its FX revenue trading, even though many of its contracts call for pricing that should have resulted in no profit to State Street.  It would have been a simple task to ensure that the exchange rates entered into the WSS system and the MOMS.  Yet, the illegal overcharging of State Street's clients through the FX scheme continued unabated for eight years.

## STATE STREET'S OVER-EXPOSURE TO OFF-BALANCE SHEET ASSET-BACKED CONDUITS

83.     While State Street was artificially inflating its revenues through the fraudulent FX scheme, the Individual Defendants were also misleading the market regarding State Street's exposure to billions of dollars of losses in MBS.

84.     MBS are securities that receive their cash flows directly through "pools" (often thousands) of residential mortgages, and can be secured by three types of underlying mortgages. The first, called "A-paper" mortgages, are the highest rated and are issued to homeowners who have the strongest credit.  The second, known as "Alt-A" mortgages, are made to borrowers that have much lower credit scores, and the loans typically have high loan-to-value ratios (LTV) and no or

limited documentation of the borrower's income.  The lowest rated mortgages are called "subprime," which are issued to borrowers who have extremely low credit scores and generally require the borrower to submit almost no documentation.

85.     State Street held billions of dollars of risky MBS and subprime investments in both its conduits and investment portfolio.  Conduits are off-balance sheet special purpose entities that raised money by issuing commercial paper to institutional clients.  The conduits used proceeds from the sale of the commercial paper to purchase MBS and other assets.  During the time complained of, State Street administered four asset-backed commercial paper conduits with an aggregate total asset value ranging from $23 billion to $28 billion.  Two of the conduits were based in the United States (the so-called "Galleon" and "Clipper" conduits) and two were based in Australia (the so-called "Spinnaker" and "Schooner" conduits).  Through these conduits, State Street marketed and sold commercial paper to its institutional clients.  The conduits used the proceeds from the sale of commercial paper to purchase MBS and other assets.  According to Moody's Investor Service ("Moody's"), in the third quarter of 2008, State Street was the sixth-largest administrator of asset-backed commercial paper in the United States.

86.     State Street also managed a large portfolio of investment securities for its own benefit.  According to defendants Logue, Resch, Albright, Burnes, Coym, Darehshori, Fawcett, Goldstein, Gruber, Hill, LaMantia, Miskovic, Sergel, Skates, Summe, Walsh, and Weismann, in State Street's 2006 Form 10-K filed on February 20, 2007, the Company's "investment securities portfolio has many objectives, the foremost of which is to generate maximum return with modest duration and credit risk."  The overall size of State Street's investment portfolio increased from approximately $65 billion in 2006 to approximately $80 billion at year end 2008.

87.     At all relevant times, the majority of the assets in State Street's conduits were MBS collateralized primarily by Alt-A loans.  For instance, as of the first quarter of 2008, approximately $15.5 billion of the total $28.3 billion (nearly 55%) of conduit assets were contained in these types of MBS investments, and this percentage was never lower than 53% at any point from October 17, 2006 to October 19, 2009.

88.     By the first quarter of 2007, significant problems with Alt-A loans were being widely reported.  Industry participants learned that most Alt-A loans were no different from subprime loans in terms of their underwriting and performance.  For example, a *MarketWatch* article dated March 11, 2007, entitled "Subprime Mortgage Woes May Be Spreading," explained that "[A]s the Alt-A business grew [from 2003 to 2007], more of these loans were offered to less creditworthy borrowers, creating what Mark Adelson, head of structured finance research at Nomura Securities International, calls 'Alt-B' products."  In the same article, Mr. Adelson was quoted as stating:  "the Alt-A market has absorbed and disguised a portion of the subprime space .... You can debate how to define these loans, but many have ended up being an Alt-A product with subprime deficiencies."

89.     Like the conduits, State Street's investment portfolio also had a significant portion of its assets in MBS, including not only a substantial amount of securities collateralized by Alt-A loans but also billions of dollars in highly-toxic subprime mortgages – the riskiest and mostly likely to default of all MBS.  At year-end 2008, more than $25 billion (out of a total of $78 billion) of State Street's investment portfolio consisted of MBS collateralized by Alt-A and subprime mortgages.  Significantly, between the third quarter of 2007 and the fourth quarter of 2008, State Street's investment portfolio contained between $5.5 billion and $6.6 billion in subprime mortgages.

**Defendants Assure Investors that Company Assets were "High Quality"**

90.     The collapse of the housing market, rising interest rates, and increasing defaults and delinquencies led to a massive weakening of the mortgage and credit markets.  Between October 2007 and October 2008, the collapse of the real estate markets impacted some of the largest financial institutions in the world.  In early 2007, market observers and research analysts linked declining housing prices, falling new home construction, rising interest rates, and increasing defaults directly to weakening MBS markets.  In the first quarter of 2007, Moody's reported that "loans securitized in the first, second and third quarters of 2006 have experienced increasingly higher rates of early default than loans securitized in previous quarters."  Moody's also reported that there was a "pattern of serious delinquencies" in mortgages issued during 2006.  During this time, Merrill Lynch, Citigroup, and Bear Stearns were just a few of the companies that announced billions in subprime exposure and write-downs.  These conditions created a substantial risk of increased losses in MBS

assets such as those owned by State Street in its conduits and investment portfolio. By spring 2007, the risks to State Street became the subject of intense investor concern. As a result, during each quarter from April 2007 forward, defendants were asked to address these issues in their quarterly earnings releases and on conference calls with investors. The Company's fiduciaries, however, continually downplayed State Street's exposure throughout the financial crisis and declining real estate market by assuring investors starting in 2007 that its assets were "high quality" and posed no risk.

91.    For instance, in the Company's Form 8-K filed with the SEC on October 16, 2007 (and in each quarterly earnings release after), the Company assured investors that the conduit assets and investment portfolio are "*subject to significant internal controls*," that included: "*[a] dedicated surveillance team responsible for monthly monitoring of asset performance*"; "[*r]obust liability management oversight, including economic and market updates, and weekly management meetings*"; and "*[a] [d]edicated administration team responsible for asset and liability administration, annual audits and accounting policy*."

92.    Defendants also assured investors that the Company's Enterprise Risk Management Committee ("ERM") "monitors asset performance monthly through management's surveillance reporting." State Street's ERM was described as follows in the Company's Forms 10-K filed since October 2006:

> Enterprise Risk Management, or "ERM," a dedicated corporate group, provides oversight, support and coordination across business units and is responsible for the formulation and maintenance of enterprise-wide risk management policies and guidelines. In addition, ERM establishes and reviews approved limits, and with the support of business line management, monitors key risks. The head of ERM meets regularly with the Board or a Board committee, as appropriate, and has the authority to escalate issues as necessary.

93.    On State Street's earnings conference call held on October 16, 2007, defendant Resch stated:

> The conduits … *are subject to a rigorous credit review process, which includes independent oversight of all asset purchases…. We believe our approach to the asset-backed commercial paper market is different than most other programs…. The financial performance of the conduits during this time has been very strong. They have never suffered a credit loss on any asset they purchased, evidence of the strong credit discipline that I just referred to.*

94.     On the same conference call, defendant Logue declared:

*[W]e will not exit the [conduit business].  We apply strict risk and compliance procedures to the assets we purchase and will continue to do so.*  We will, however, review this program in the light of the type of market disruptions we have experienced….  *This issue is not about credit quality or liquidity.*  It is about balance sheet capacity.

95.     These statements regarding the Company's close monitoring of its conduits and investment portfolio were critical to investors because State Street did not disclose the specific assets contained in these programs.  Rather, State Street provided some information broadly disclosing the "asset classes" and a general breakdown of the ratings for those broad groups of securities in the conduits and investment portfolio, without identifying any of the specific investments.  Investors had no choice but to rely on State Street's assurances that its conduit and investment assets were performing well and were being closely monitored by State Street's management.

96.     In the Company's public filings and on conference calls, defendants consistently assured the market that the Alt-A and subprime MBS and other assets in the conduit and investment portfolio were "high quality," performing well, and posed no risk to State Street.  For instance, on the Company's earnings conference call held on July 17, 2007, defendant Resch stated:

Last quarter I was asked about our asset-backed securities in the investment portfolio that are backed by subprime mortgages. Since there has been continuing interest in that subject, let me add some color ... [these securities] have performed very well.... So we are very comfortable in terms of our entire asset-backed position, as well as the position that is backed by the sub prime mortgages.  We don't expect any significant negative financial outcomes due to this element of our investment portfolio.

97.     On State Street's earnings conference call held on October 16, 2007, defendant Logue stated, "*we  do not have concerns as to the overall quality of the underlying assets in the conduits*," which he described as, "*high quality*." Indeed, defendant Resch assured investors that, despite the downturn in the markets, State Street's investments were performing well:

*So what happened in the third quarter? Overall, the asset-backed commercial paper program performed very well in a period of extreme market stress. We believe that our asset quality was a major point of differentiation for our conduits during a period of time when some weaker programs faded away.*

98.     The housing and financial markets experienced a devastating collapse between October 2007 and October 2008, which impacted and crushed some of the largest financial institutions in the world.  On October 5, 2007, Merrill Lynch announced that it was writing down $5.5 billion of its subprime exposure, a number that it increased to $8.4 billion three weeks later.  On November 5, 2007, Citigroup disclosed that its subprime holdings were permanently impaired by $11 billion, including significant losses in so-called "high grade" (i.e., highly-rated) subprime MBS.

99.     On December 19, 2007, Morgan Stanley announced that it was taking a $9.4 billion write-down relating to subprime losses.  On December 20, 2007, Bear Stearns reported the first quarterly loss in its eight-four-year history, of $854 million.  The loss was primarily caused by a write-down of $1.9 billion of subprime and Alt-A debt.

100.    Throughout the first three quarters of 2008, the world's major financial institutions continued to announce stunning and unprecedented losses in their holdings of MBS.

101.    On September 7, 2008, the United States Treasury placed the two largest mortgage securitization companies into Government "conservatorship" in order prevent their collapse.  The Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") owned or guaranteed nearly half of the $12 trillion U.S. mortgage market.

102.    On October 15, 2008, in State Street's Form 8-K and press release, the Company disclosed its financial results for the third quarter of 2008.  In that press release, defendant Logue stated "***as we have said in the past, the asset quality of both our investment portfolio and the conduit program remains high***."

103.    Defendant Logue made similar statements on the Company's earnings conference call held on October 15, 2008, assuring investors that these assets "***are of high quality***." On that conference call, defendant Resch highlighted the supposed superior performance of the conduit program as "***evidence of our strong credit discipline***."

104.    Defendant Logue assured investors that the market disruptions discussed above posed little risk to State Street, stating:

*Looking at the turmoil resulting from the illiquidity in the capital markets, I am particularly proud of the performance of State Street, not only in the third quarter, but in many of the decisions we've made over the past year to prepare for the current market environment.*

*Because of our strong performance in the first nine months of 2008, we continue to confirm our earlier statements regarding our performance to our financial goals.*

105.   On the October 15, 2008 earnings conference call, defendant Resch assured investors that the "**high quality**" of the conduit assets ensured that State Street would not be required to consolidate the conduits onto its balance sheet (which would become necessary if the conduits suffered significant losses or experienced a significant liquidity event): "***Due to the high quality of the assets and their performance, we do not currently believe we need to consolidate the conduits***."

106.   When specifically questioned about the conduits by analysts and investors on the earnings conference call, defendant Logue went to great lengths to assure the public that these assets were performing well and would not face any problems in the future.  For instance, one analyst asked Logue, "there has [sic] been about 10 questions on the conduit for every one question on the core business.  Is there any point where you would consider proactively consolidating the conduit and just try to put it behind you[?]"  Logue responded, "***No, because I don't think that is not the way to spend the shareholders' money.  We think this is money good.  I can think of a lot better ways to spend the shareholders' money***."

107.   Defendants continued to make improper statements about the conduits and investment portfolio deep into the fourth quarter of 2008.  On November 10, 2008, State Street filed its Form 8-K with the SEC that attached a presentation on State Street's conduits and investment portfolio, which defendants Logue and Resch would discuss at an investment banking conference on November 11, 2008.  The Form 8-K repeated many of the same statements made by these defendants on October 15, 2008, including describing the conduits as having "***strong overall asset quality***."  The Form 8-K also stated that the "***Investment Portfolio remains of high quality and well diversified***."  The presentation also reiterated that the investment portfolio's assets were "***selected using a rigorous credit process***."

**State Street Finally Discloses Its Liquidity Problems and Unrealized Losses in Its Conduit and Investments Programs**

108.    Just two months after defendants Logue and Resch improperly assured investors that State Street's conduit and investment portfolio assets were "high quality" and performing well, the truth began to emerge.   On January 16, 2009, State Street disclosed in its Form 8-K that it was experiencing liquidity problems that required the Company to purchase $8.9 billion of its own conduits' commercial paper, and that the unrealized losses in the conduit and investment programs nearly doubled from the $5.4 billion disclosed on October 15, 2008 to $9.9 billion.

109.    On January 20, 2009 – the first trading day after the January 16, 2009 disclosures – State Street filed a Form 8-K stating:

> [U]nrealized mark-to-market losses in the investment portfolio increased to $6.3 billion ... up $3.0 billion from September 30, 2008, and in the State Street administered asset-backed commercial paper conduits increased to $3.6 billion up $1.4 billion from September 30, 2008.

110.    The unrealized losses in State Street's conduit program and investment portfolio had increased by $4.4 billion to $9.9 billion, in the two months since defendants Logue and Resch had assured investors that these assets were "high quality" and posed no risk.

111.    The market reacted to these disclosures with a massive sell-off of State Street's stock, which plummeted almost 60% in a single trading day, wiping out nearly $8 billion in market capitalization.   In response, every major credit rating agency downgraded the Company.   As one analyst stated in a report issued on January 21, 2009, "the Company's credibility, as measured by its stock price change, has been dramatically weakened."

112.    On May 18, 2009, State Street publicly disclosed that it had consolidated the conduits as of May 15, 2009.

### THE IMPROPER STATEMENTS IN CONNECTION WITH THE COMPANY'S STOCK OFFERING

113.    On June 3, 2008, the Company completed a public offering of 40.5 million shares of State Street common stock, reaping $2.8 billion in proceeds (the "Offering").   The Offering was conducted pursuant to a shelf registration statement filed on March 21, 2006.   A shelf registration statement permits an issuer to register company securities for issuance at a later (at which point the security is taken off the "shelf" and offered to investors).   In addition to the shelf registration

statement, the Offering was also issued pursuant to a prospectus supplement dated June 3, 2008 (collectively, the "Offering Materials").

114.    The Offering Materials incorporated by reference specific State Street public filings. In particular, the filings incorporated were State Street's Annual Report on Form 10-K for the fiscal year ended December 31, 2007; the Company's Quarterly Report on Form 10- Q for the quarter ended March 31, 2008; and, State Street's Current Reports on Form 8-K filed on January 3, 2008, January 17, 2008, January 25, 2008, April 7, 2008, May 5, 2008, and June 2, 2008.  These filings contained improper statements, which were incorporated into the Offering Materials, thus making them improper.  As described above, the Company's revenue and earnings were artificially inflated by the systemic overcharging of the Company's custodial clients for the FX transactions.

115.    In addition, the Offering Materials contained improper statements concerning the Company's conduit program and investment portfolio.  As already explained above, the conduits contained large amounts of toxic MBS and State Street's own investment portfolio contained billions in risky Alt-A and subprime MBS.  Before the Offering, however, while the rest of the financial market underwent a meltdown, the Individual Defendants continued to allow State Street to claim that its investment portfolio and conduits were sound and had "strong overall asset quality."  In addition, defendants Resch, Logue, Albright, Burnes, Coym, Darehshori, Fawcett, Goldstein, Gruber, Hill, LaMantia, Miskovic, Sergel, Skates, Summe, Walsh, and Weissman stated in the Company's 10-K filed on February 15, 2008, that "none of the conduits' portfolio securities were predominately collateralized by subprime real estate mortgages" and the Company's increasing investment in MBS and other MBS did not adversely affect its overall risk.  These improper statements were incorporated by reference into the Offering Materials.

116.    Defendants Logue, Resch, Gormley, Burnes, Coym, Darehshori, Fawcett, Gruber, Hill, LaMantia, Miskovic, Sergel, Skates, Summe, and Weissman, as signors of the registration statement, bear the responsibility for the improper statements contained within it. Indeed, Judge Gertner on August 3, 2011, denied these defendants' motions to dismiss the federal securities class action case brought against them by investors that purchased State Street stock in the Offering.

## IMPROPER STATEMENTS: SUMMARY

117.     As explained in detail above, the Company overstated its revenue and earnings in its quarterly and yearly financial statements filed with the SEC due to the illegal FX trading scheme. Further, in the Company's quarterly and yearly financial statements were all improper because of their failure to disclose the true health of the Company's off-balance sheet conduits and investments. The following table details the Individual Defendants directly responsible for the improper statement contained in each of these filings.

| Date | Filing | Person(s) Who Signed and Certified |
|------|--------|-----------------------------------|
| 3/21/2006 | S-3ASR | Pamela D. Gormley (Executive Vice President and Corporate Controller); Ronald E. Logue (Chairman, Chief Executive Officer, and Director); Edward J. Resch (Executive Vice President and Chief Financial Officer); Tenley E. Albright (Director); Kennett F. Burnes (Director); Nader F. Darehshori (Director); Arthur L. Goldstein (Director); David P. Gruber (Director); Linda A. Hill (Director); Charles R. LaMantia (Director); Richard P. Sergel (Director); Ronald L. Skates (Director); Gregory L. Summe (Director); Diana Chapman Walsh (Director); Robert E. Weissman (Director) |
| 11/3/2006 | 10-Q | Edward J. Resch (Executive Vice President and Chief Financial Officer); Pamela D. Gormley (Executive Vice President and Corporate Controller) Sarbanes-Oxley Act of 2002 ("**SOX**") **CERTIFICATION:** Ronald E. Logue (CEO); Edward J. Resch (CFO) |
| 2/20/2007 | 10-K | Edward J. Resch (Executive Vice President, Chief Financial Officer, and Treasurer); Ronald E. Logue (Chairman, Chief Executive Officer, and Director); Tenley E. Albright (Director); Kennett F. Burnes (Director); Peter Coym (Director); Nader F. Darehshori (Director); Amelia C. Fawcett (Director); Arthur L. Goldstein (Director); David P. Gruber (Director); Linda A. Hill (Director); Charles R. LaMantia (Director); Maureen J. Miskovic (Director); Richard P. Sergel (Director); Ronald L. Skates (Director); Gregory L. Summe (Director); Diana Chapman Walsh (Director); Robert E. Weissman (Director). **SOX CERTIFICATION:** Ronald E. Logue (CEO); Edward J. Resch (CFO) |
| 5/4/2007 | 10-Q | Edward J. Resch (Executive Vice President, Chief Financial Officer, and Treasurer); **SOX CERTIFICATION:** Ronald E. Logue (CEO); Edward J. Resch (CFO) |
| 8/3/2007 | 10-Q | Edward J. Resch (Executive Vice President, Chief Financial Officer, and Treasurer); **SOX CERTIFICATION:** Ronald E. Logue (CEO); Edward J. Resch (CFO) |
| 11/2/2007 | 10-Q | Edward J. Resch (Executive Vice President, Chief Financial Officer, and Treasurer); **SOX CERTIFICATION:** Ronald E. Logue (CEO); Edward J. Resch (CFO) |
| 2/15/2008 | 10-K | Edward J. Resch (Executive Vice President and Chief Financial Officer); Ronald E. Logue (Chairman, Chief Executive Officer, and Director); Tenley E. Albright (Director); Kennett F. Burnes (Director); Peter Coym (Director); Nader F. Darehshori (Director); Amelia C. Fawcett (Director); Arthur L. Goldstein (Director); David P. Gruber (Director); Linda A. Hill (Director); Charles R. LaMantia (Director); Maureen J. Miskovic (Director); Richard P. Sergel (Director); Ronald L. Skates (Director); Gregory L. Summe (Director); Diana Chapman Walsh (Director); Robert E. Weissman (Director) **SOX CERTIFICATION:** Ronald E. Logue (CEO); Edward J. Resch (CFO) |

| | | |
|---|---|---|
| 5/9/2008 | 10-Q | Edward J. Resch (Executive Vice President and Chief Financial Officer); **SOX CERTIFICATION:** Ronald E. Logue (CEO); Edward J. Resch (CFO) |
| 8/1/2008 | 10-Q | Edward J. Resch (Executive Vice President and Chief Financial Officer); **SOX CERTIFICATION:** Ronald E. Logue (CEO); Edward J. Resch (CFO) |
| 11/5/2008 | 10-Q | Edward J. Resch (Executive Vice President and Chief Financial Officer); **SOX CERTIFICATION:** Ronald E. Logue (CEO); Edward J. Resch (CFO) |
| 2/27/2009 | 10-K | Edward J. Resch (Executive Vice President and Chief Financial Officer); Ronald E. Logue (Chairman, Chief Executive Officer, and Director); Kennett F. Burnes (Director); Peter Coym (Director); Nader F. Darehshori (Director); Amelia C. Fawcett (Director); David P. Gruber (Director); Linda A. Hill (Director); Charles R. LaMantia (Director); Richard P. Sergel (Director); Ronald L. Skates (Director); Gregory L. Summe (Director); Robert E. Weissman (Director) **SOX CERTIFICATION:** Ronald E. Logue (CEO); Edward J. Resch (CFO) |
| 5/4/2009 | 10-Q | Edward J. Resch (Executive Vice President and Chief Financial Officer); **SOX CERTIFICATION:** Ronald E. Logue (CEO); Edward J. Resch (CFO) |
| 8/10/2009 | 10-Q | Edward J. Resch (Executive Vice President and Chief Financial Officer); **SOX CERTIFICATION:** Ronald E. Logue (CEO); Edward J. Resch (CFO) |

### THE WASTEFUL STOCK REPURCHASE

118.     On July 20, 2007, the Company announced that it entered into a $1 billion stock repurchase agreement with an affiliate of Lehman Brothers.  Under the agreement, State Street committed to repurchase $1 billion of its own stock over a six-month period at market price.   The Company bought back its stock in three lumps.   In July 2007, it repurchased 9,551,000 shares of its stock at an average price of $74.97 per share for a total of slightly more than $716 million.   The next month, the Company repurchased 3,818,000 shares of its own stock at an average price of $74.97 per share for a total of over $286 million.  Finally, in January 2008, the Company repurchased 552,000 shares of its own stock at an average price of $72.72 per share for a total of over $40 million.  In total, the Company repurchased 13,921,000 shares at an average price per share of $74.88, for just over $1 billion.

119.     In approving this transaction, defendants Albright, Burnes, Coym, Darehshori, Fawcett, Goldstein, Gruber, Hill, LaMantia, Logue, Miskovic, Sergel, Skates, Summe, Walsh, and Weissman knowingly or recklessly wasted the Company's assets by causing it to repurchase its own stock and substantially inflated levels.  When the truth about the Company's illegal FX scheme, conduits, and investments finally fully came to light on October 20, 2009, State Street's stock fell to just $45.88, $29 per share less than it paid to purchase its own stock.  Thus, the Company wasted over $400 million through the repurchase.

**DAMAGES TO STATE STREET CAUSED BY THE INDIVIDUAL DEFENDANTS**

120.     Because of the Individual Defendants' improprieties, State Street disseminated improper statements concerning its financial performance as alleged above. These improper statements have devastated State Street's credibility as reflected by the Company's market capitalization loss of nearly $14 billion.

121.     Further, as a direct and proximate result of the Individual Defendants' actions, State Street has expended, and will continue to expend, significant sums of money. The expenditures include, but are not limited to:

(a)     billions in losses from the Company and its conduits' reckless investments in risky MBS;

(b)     the costs incurred in investigating and defending State Street and certain officers and directors in the various actions commenced by participants in its lending programs, multiple securities class actions, the California *qui tam* action, and other state and government actions;

(c)     the costs incurred in dealing with the SEC's inquiry and conducting any internal investigations;

(d)     the costs incurred from paying for the Company's stock at inflated prices;

(e)     the costs of settling or satisfying an adverse judgment in all the various litigation; and

(f)     the costs of compensating and paying for benefits for officers and directors who have breached their duties to State Street.

122.     Moreover, these actions have irreparably damaged State Street's corporate image and goodwill. Former clients have already begun announcing that they will no longer retain State Street because of the FX scheme. For example, on March 19, 2012, Ohio's Attorney General Michael DeWine announced that he was replacing State Street with JP Morgan as a custodian for four Ohio pension funds.

## DERIVATIVE AND DEMAND ALLEGATIONS

123.    Plaintiff brings this action derivatively in the right and for the benefit of State Street to redress injuries suffered, and to be suffered, by State Street as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as aiding this conduct, by the Individual Defendants.

124.    Plaintiff will adequately and fairly represent the interests of State Street in enforcing and prosecuting its rights.

125.    Plaintiff has been a continuous shareholder of State Street since 2008.

126.    Plaintiff has made a demand upon the Board to investigate and remedy the violations of law described herein as required by Federal Rule of Civil Procedure Rule 23.1 and Massachusetts law.  As set forth below, the Board improperly appointed a conflicted Special Committee to consider plaintiff's demand and then purportedly relied on this Special Committee to reject his demand.

127.    On October 13, 2011, plaintiff sent a litigation demand letter to the Board (the "Demand Letter").  The Demand Letter detailed the illegal FX trading scheme, the Company's overexposure to the MBS in its off-balance sheet conduits, and the improper statements concerning the Company's health and business prospects.  The Demand Letter demanded that the Board investigate and commence proceedings against the officers and directors of the Company that were responsible for the mismanagement, misstatements, and related misconduct detailed therein.  A true and correct copy of the Demand Letter is attached hereto as Exhibit A.

128.    On November 1, 2011, plaintiff's counsel received a letter from Michael J. Chepiga, Esq.  Mr. Chepiga stated that the Board retained his law firm, Simpson Thacher & Bartlett LLP, as "special counsel" to assist it in responding to the Demand Letter.  Mr. Chepiga also asked that plaintiff provide him with proof that it held stock from 2006 through 2009 and all factual information supporting the Demand Letter.  A true and correct copy of the November 1, 2011 letter is attached hereto as Exhibit B.

129.    Plaintiff responded to Mr. Chepiga in a letter dated November 15, 2011.  Plaintiff explained that it had already complied with all the technical requirements to make a demand upon the Board, including identifying itself, specifying the misconduct that gave rise to the demand, and

the potential claims that the Board could pursue.  In addition, plaintiff assured Mr. Chepiga that it was a current shareholder.   A true and correct copy of the November 15, 2011 letter is attached hereto as Exhibit C.

130.   On November 21, 2011, Paul C. Curnin, Esq. of Simpson Thacher & Bartlett LLP responded to plaintiff, stating that a "special committee of the Board's independent directors has agreed to look into the matters raised in [plaintiff's] October 13 letter."  The November 21, 2011 letter also reiterated Mr. Chepiga's previous request for proof of plaintiff's current stock ownership in State Street and ownership since 2006.  A true and correct copy of the November 21, 2011 letter is attached hereto as Exhibit D.

131.   On December 13, 2011, plaintiff responded to Mr. Curnin's letter.  Despite having no legal obligation to provide proof of stock ownership, plaintiff enclosed a recent brokerage statement proving that it was indeed a State Street shareholder with its letter, in order to prevent needless delay resolving non-substantive issues, especially in light of the significant harm done to the Company.  In addition, plaintiff directed the Board's attention to fifteen subjects of materials and documents that it believed supported the allegations of wrongdoing contained in its Demand Letter.  Plaintiff also requested that the Board identify the members of the Special Committee and provide it with documentation evidencing the Special Committee's create and charge.  A true and correct copy of the December 13, 2011 letter is attached hereto as Exhibit E.

132.   On December 20, 2010, Mr. Curnin wrote to plaintiff, revealing that the members of the Special Committee as defendants Burnes, Fawcett, and Kaplan.  Though Mr. Curnin provided plaintiff with the names of the Special Committee members, he did not provide any documentation concerning the Special Committee's creation or charge.

133.   Plaintiff was dismayed to learn the members of the Special Committee.  As explained above, defendants Burnes and Fawcett are defendants in the federal securities action.  These two defendants are responsible and liable for the improper statements contained in the Offering Materials explained above.  Further, at the time plaintiff made its demand, Judge Gertner of the District of Massachusetts had already denied Burnes and Fawcett's motion to dismiss the securities claims against them.  Therefore, the Board placed two of the very people facing significant liability to the

Company for the improper statements State Street issued to the public onto the Special Committee. In addition, defendant Burnes was named as the Chair of the Special Committee.

134.    The Board's choice of the Special Committee is even more disheartening when considering that there are three Board members that are not named as defendants in the Securities Action.   The Board acted disloyally when it chose obvious conflicted individuals to consider plaintiff's demand, and then relied on those conflicted individuals in deciding not pursue plaintiff's litigation demand.   Defendants Burnes and Fawcett also betrayed their fiduciary duty of loyalty by accepting appointment to the Special Committee, despite knowing that they were defendants in a securities class action that had already survived a motion to dismiss and the serious and significant liability they faced in that action.

135.    In light of these facts, it came as no surprise when Mr. Curnin informed plaintiff on January 31, 2012, that the Special Committee recommended rejecting plaintiff's demand and the Board adopted this recommendation.

136.    The Board's reliance on a Special Committee in which at least two-thirds of its members face significant and serious threat of liability is completely at odds with the Board's duty to consider the Demand Letter independently, objectively, reasonably, and in good faith.

137.    The Board's decision to refuse the demand was contrary to State Street's best interests. Defendants breached their fiduciary duties to the Company, wasted hundreds of millions of dollars, caused or permitted the Company to engage in an illegal FX trading scheme, and caused or permitted the Company to violate federal securities laws, exposing State Street to billions of dollars in damages and irreparably damaging State Street's most valuable asset, its reputation.   The claims in the Demand Letter are well-founded, valuable, and the Company's only hope of recovery.

138.    Plaintiff has not made any demand on the other shareholders of State Street to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     State Street is a publicly held company with over 487 million shares outstanding and thousands of shareholders;

(b)      making demand on such a number of shareholders would be impossible for Plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)      making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

139.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

140.    The Individual Defendants owed State Street fiduciary obligations of due care and loyalty, and were and are required to use their utmost ability to control and manage State Street in a fair, just, honest, and equitable manner.

141.    The Director Defendants breached their duties of loyalty by completely and utterly failing to implement adequate internal controls, which allowed the FX scheme to flourish and the Company's overexposure to MBS.  In addition, all of the Director Defendants breached their duties of loyalty by failing to ensure that an adequate system of internal control was in place to oversee the Company's financial and reporting process.

142.    Defendants Resch and Logue violated their fiduciary duties of loyalty and care by making improper statements in earnings press releases about the Company's exposure in its MBS portfolio and conduits and about the Company's revenue and earnings while hiding the inflation in these numbers due to the illegal FX trading scheme occurring at the Company.

143.    Defendants Burnes, Coym, Darehshori, Fawcett, Gruber, Hill, LaMantia, Sergel, Skates, Summe, and Weissman violated their fiduciary duties of loyalty by making improper statements in earnings press releases about the Company's exposure in its MBS portfolio and conduits and about the Company's revenue and earnings while hiding the inflation in these numbers due to the illegal FX trading scheme occurring at the Company.

144.    The Examining and Audit Committee Defendants breached their fiduciary duty of loyalty by approving the improper statements.  The Examining and Audit Committee Defendants also failed in their duties of oversight, including their duties of oversight of the financial and

reporting process, and of reviewing earnings press releases, as required by the Examining and Audit Committee Charter.

145.    All of the Director Defendants breached their duty of loyalty by knowingly or recklessly making improper statements concerning: (i) the Company's exposure in its MBS portfolio and conduits; (ii) the Company's revenue and earnings while hiding the inflation in these numbers due to the illegal FX trading scheme occurring at the Company; and (iii) the Company's internal controls.

146.    Defendants Albright, Burnes, Coym, Darehshori, Fawcett, Goldstein, Gruber, Hill, LaMantia, Logue, Miskovic, Sergel, Skates, Summe, Walsh, and Weissman breached their duty of loyalty by authorizing the $1 billion repurchase at a time when they knew or should have known that the Company's stock was materially inflated.

147.    But for the abdication of the Individual Defendants' fiduciary duties, the Company would not have been damaged.  Thus, all of the Individual Defendants breached their fiduciary duties.

148.    As a direct and proximate result of Individual Defendants' failure to perform their fiduciary obligations, State Street has sustained significant damages. Because of the misconduct alleged in this Complaint, these defendants are liable to the Company.

149.    Plaintiff, on behalf of State Street, has no adequate remedy at law.

## COUNT II

### Assets Against the Individual Defendants for Waste of Corporate Assets

150.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

151.    The Individual Defendants wasted corporate assets by: (i) paying undeserved incentive compensation to certain of State Street's officers; (ii) paying undeserved director remuneration to State Street's directors; (iii) incurring potentially millions of dollars of liability and legal costs to defend Individual Defendants' unlawful actions; (iv) concentrating the Company's investment in MBS that turned out to be worth billions less than stated; and (v) buying $1 billion worth of the Company's stock at a time when its stock price was artificially inflated.

152.    Because of the waste of corporate assets, the Individual Defendants are liable to the Company.

153.    Plaintiff, on behalf of State Street, has no adequate remedy at law.

### COUNT III

### Against the Individual Defendants for Unjust Enrichment

154.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

155.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of State Street through the receipt of the bonuses, salaries, and other remuneration detailed above while failing to act in accordance with their fiduciary duties.

156.    Plaintiff, as a shareholder and representative of State Street, seeks restitution from each Individual Defendant, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by each Individual Defendant, from its wrongful conduct and fiduciary breaches.

157.     Plaintiff, on behalf of State Street, has no adequate remedy at law.

### PRAYER FOR RELIEF

Plaintiff therefore requests, on behalf of State Street, judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company because of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment.

B.    Directing State Street to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect State Street and its shareholders from a repeat of the damaging events described in this Complaint including, but not limited to, putting forward for shareholders vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.      a provision to increase the transparency in the Company's FX trading practices;

2.      a provision to prevent the Company from becoming responsible for off-balance sheet holdings, such as the conduits mentioned above;

3.      a proposal to strengthen the Board's supervision of the Company's investments, including investments in MBS;

4.      a proposal to strengthen the Company's controls over financial reporting;

5.      a proposal to remove from the Board those members who have breached their fiduciary duties to State Street;

6.      a proposal to implement procedures for greater shareholder input into the policies and guidelines of the Board; and

7.      a provision to permit the shareholders of State Street to nominate candidates for election to the Board;

C.      Extraordinary equitable and injunctive relief as permitted by law, equity, and state statutory provisions, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of Individual Defendants' trading activities or their other assets to ensure that plaintiff on behalf of State Street has an effective remedy;

D.      Awarding to State Street restitution from the Individual Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting further relief as the Court deems proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: April 30, 2012

PARTRIDGE, ANKNER &  HORSTMANN, LLP
PETER C. HORSTMANN

_____
PETER C. HORSTMANN

The Berkeley Building
200 Berkeley Street, 16th Floor
Boston, MA  02116
Telephone: (617) 859-9999
Facsimile:  (617) 859-9998
pete@hortsmannlaw.com

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
FELIPE J. ARROYO
SHANE P. SANDERS
KEVIN S. KIM
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsumeda.com
farroyo@robbinsumeda.com
sanders@robbinsumeda.com
kkim@robbinsumeda.com

Attorneys for Plaintiff

508529